## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE:                               )   Bankruptcy No. 09 B 17575
                                     )   Chapter 11
MULTIUT CORPORATION,                 )   Judge John H. Squires
                                     )
              Debtor.                )

### MEMORANDUM OPINION

This matter comes before the Court on confirmation of the first amended Chapter 11 plan

of reorganization (the "Plan") filed by Multiut Corporation (the "Debtor") and the objections

thereto filed by Dynegy Marketing and Trade ("Dynegy"). For the reasons set forth herein, the

Court sustains in part Dynegy's objections and denies confirmation of the Plan. Because the

Court has denied confirmation of the Plan and the case has been pending for approximately two

years, the Court sets a hearing on May 24, 2011, at 10:00 a.m. to determine whether the case

should be converted to Chapter 7 or dismissed.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and

Internal Operating Procedure 15(a) of the United States District Court for the Northern District

of Illinois. Confirmation of a plan of reorganization is a core proceeding under 28 U.S.C. §

157(b)(2)(L).

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

APR 19 2011

KENNETH S. GARDNER, CLERK
TEAM - C

-2-

## II. **FACTS AND BACKGROUND**

On May 14, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Dynegy Ex. No. 20.) The Debtor has supplied energy consulting services since 1986 and has been solely owned by Nachshon Draiman ("Draiman") since 1999. (Debtor Ex. No. 3 at p. 10.) Draiman also serves as president of the Debtor. (Trans. 350:24 - 351:2.) Draiman filed a separate Chapter 11 bankruptcy petition (09 B 17582) on May 14, 2009.

The Debtor's primary business model is to partner with clients in a "Shared Savings" program by which the Debtor would purchase natural gas for its clients from suppliers at prices lower than those offered by local companies and then share those savings with customers. (Debtor Ex. No. 3 at p. 10.) In the fall of 2003, the Debtor entered into an agreement with Better Energy Services and Technology, Inc. ("BEST") to form Multiut, LLC, in which BEST held an eighty percent interest and the Debtor held a twenty percent interest. (*Id.* at p. 12.) BEST contributed capital while the Debtor contributed customer contracts and entered into a management services contract to provide sales, administrative, and back-office services to Multiut, LLC. (*Id.* at pp. 12-13.) The Disclosure Statement explains that the Debtor is entitled to reimbursement of expenses and a management fee of not less than $25,000 per month as well as a percentage of profits.[1] (*Id.* at p. 13.) The Debtor operates its business from a location leased from LCF Associates ("LCF"). (Trans. 385:17 - 18; 385:24 - 386:1.) Draiman owns seventy-five

---

[1] The Court wonders whether the Disclosure Statement was mistaken in stating that the Debtor is entitled to a management fee of not less than $25,000 per *month* from Multiut, LLC. Nowhere in the Debtor's budget projections under the Plan is that number reflected on a per month basis. (Debtor Ex. No. 5.)

-3-

percent of LCF and Ron Shabat ("Shabat"), his friend and business partner, owns the other twenty-five percent. (*Id.* at 385:19 - 23.)

Dynegy is a Colorado general partnership with its principal place of business in Houston, Texas. The Debtor and Draiman have been involved in litigation with Dynegy since 2002. (Debtor Ex. No. 3 at pp. 10-13.) Dynegy filed a complaint against the Debtor and Draiman in the United States District Court for the Northern District of Illinois (the "Illinois Litigation"). Dynegy alleged that the Debtor failed to pay for natural gas that was delivered to it in 2000, 2001, and 2002. Draiman was named in the lawsuit as a guarantor of the payments owed by the Debtor. On June 11, 2008, the District Court entered a judgment of $15,348,244.72 plus interest against the Debtor and Draiman. (Dynegy Ex. Nos. 14 & 30.) On June 23, 2010, the District Court denied a second motion to reconsider. (Dynegy Ex. No. 30.) Thereafter, on July 16, 2010, the District Court entered an amended judgment that specified that amount with interest due to Dynegy by the Debtor and Draiman is $22,623,392.18. (Dynegy Ex. Nos. 14 & 30.) An appeal is pending before the Seventh Circuit and oral arguments were set for January 12, 2011. (Trans. 76:22 - 77:3.)

The Debtor filed a lawsuit against Dynegy in December 2004 in the District Court for the Northern District of Illinois. (Debtor Ex. No. 3 at p. 14.) In this suit, the Debtor alleged that Dynegy violated the Sherman Antitrust Act, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and committed fraud. (*Id.*) Specifically, the Debtor alleged that Dynegy intentionally manipulated price indices resulting in improperly higher charges to its customers, including the Debtor. In January 2005, that case was transferred to a multi-district docket pending in the United States District Court of Nevada (the "MDL"). (*Id.* at pp. 14-15.) In January 2010,

-4-

Dynegy filed a motion for partial summary judgment challenging the Debtor's fraud and Illinois Consumer Fraud and Deceptive Practices Act claims. (*Id.* at p. 15) The motion is fully briefed and awaiting a decision from the District Court. (*Id.* at pp. 15-16.)

In April 2010, the Debtor and Draiman filed a malpractice claim in the District Court for the Northern District of Illinois against Greenberg Traurig, LLP ("Greenberg") based upon its representation of the Debtor and Draiman in the Illinois Litigation and the MDL. (*Id.* at pp. 16-17.) The Debtor alleges that Greenberg failed to preserve the Debtor's ability to participate in the MDL. (*Id.* at p.16.) In December 2010, the District Court granted the Debtor and Draiman leave to file an amended complaint. *Multiut Corp. v. Greenberg Traurig, LLP*, No. 10 C 3238, 2010 WL 5018538, at *5 (N.D. Ill. Dec. 2, 2010). (Dynegy Ex. No. 31.)

On November 11, 2009, Dynegy filed a proof of claim against the Debtor in the sum of $22,750,716.54. (Dynegy Ex. No. 6.) The Debtor filed an objection to that claim. (Docket No. 180.) On August 16, 2010, the Court overruled the Debtor's objection to Dynegy's claim because it had already been adjudicated on the merits by the District Court in Dynegy's favor. (Docket No. 207.) Also on November 11, 2009, Greenberg filed its proof of claim in the sum of $1,073,189.30. (Claims Register, Claim No. 10.)

The Debtor filed the Plan on February 16, 2010 (Debtor Ex. No. 2),[2] and a second amended disclosure statement (the "Disclosure Statement") on May 11, 2010. (Debtor Ex. No. 3.)[3] The Disclosure Statement was approved by this Court on October 7, 2010. (Docket No.

---

[2] Dynegy also submitted a copy of the Plan as an exhibit. (Dynegy Ex. No. 23.) For ease of reference, the Court will only refer to the Debtor's exhibit.

[3] Dynegy also submitted a copy of the Disclosure Statement as an exhibit. (Dynegy Ex. No. 23.) For ease of reference, the Court will only refer to the Debtor's exhibit.

-5-

221.) There are four classes under the Plan, two of which are impaired. (Debtor Ex. No. 2 at pp. 11-12.) Only Class 2, Dynegy's class, voted to reject the Plan. (Docket No. 292.)

The Plan proposes to pay administrative claims in full on the effective date (the "Effective Date") of the Plan. (Debtor Ex. No. 3 at p. 1.) Those claims are estimated to be approximately $70,000. (*Id.*) Priority claims, estimated to be around $100,000, are to be paid in full over a five-year period. (*Id.* at p. 2.) The Debtor disputes a priority claim asserted by Philip Selman, a former employee, in the amount of $194,000. (*Id.* at pp. 2 & 5.)

The Plan divides all other creditors into four classes. Class 1 is the claim of Cole Taylor Bank which holds a collateral assignment of a beneficial interest and note to certain real property located at 9824 South Michigan Avenue in Chicago, Illinois (the "Michigan Avenue Property"). (*Id.* at p. 6; Trans. 356:3 - 17.) Class 3 consists of all general unsecured claims, estimated to be approximately $305,000, excluding insider claims, which are to be paid pro-rata on a quarterly basis over two years. (Debtor Ex. No. 3 at p. 7.) Class 4 is the claim of Draiman representing his one hundred percent shareholder interest in the Debtor. (*Id.*)

Class 2 comprises the disputed claims of Dynegy, Greenberg, and the combined claims of Jack Gore and his attorney Larry D. Drury (the "Gore Claim"). (*Id.* at pp. 6-7.) The Disclosure Statement estimates the Class 2 claims at around $17 million. (*Id.* at p. 2.) It is important to note that the Disclosure Statement was filed prior to the District Court amending Dynegy's judgment to reflect interest, for a total of over $22 million. The Debtor did not file an amendment to the

-6-

Disclosure Statement to reflect that change in judgment. Likewise, the Debtor did not file an

amendment to reflect the settlement of the Gore Claim.[4] (Debtor Reply at p. 4 n.2.)

Dynegy filed objections to the Plan and the Court set an evidentiary hearing. A trial was

held on December 13, 14, and 16, 2010, to consider confirmation of the Plan and the objections

thereto. Based upon the testimony and evidence presented to the Court at the confirmation

hearing, the Court makes the following findings of fact and conclusions of law.

## III. **APPLICABLE STANDARDS**

Section 1129 of the Bankruptcy Code sets forth the substantive requirements for

confirmation of a Chapter 11 plan. In order to be confirmed, a plan must satisfy §§ 1129(a)(1)-

(16). *See In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other*

*grounds*, 526 U.S. 434 (1999). A plan that satisfies every part of § 1129(a), except for subsection

(a)(8), may be confirmed by "cram down" under § 1129(b) if the plan does not discriminate

unfairly between impaired classes and is fair and equitable to the rejecting classes. *Id.* at 961; *In*

*re S. Beach Sec., Inc.*, 376 B.R. 881, 887 n.11 (Bankr. N.D. Ill. 2007); *In re Rusty Jones, Inc.*, 110

B.R. 362, 373 (Bankr. N.D. Ill. 1990).

---

[4] On July 19, 2010, the Court entered an order allowing Gore's claim as a general unsecured claim in the sum of $200,000. (Docket No. 197.) Thereafter, on September 9, 2010, the Court entered an amended order, the substance of which did not change the previous order. (Docket No. 212.) While the testimony at trial and the Debtor's post-confirmation brief indicate that the Gore Claim was withdrawn (Trans. 357:7 - 23; Debtor Reply at p. 4 n.2), there is nothing on the docket or claims register to confirm the Debtor's statement that the Gore Claim has been withdrawn. Thus, for the purposes of this Opinion, the Court will operate on the assumption that Gore has a general unsecured claim in the amount of $200,000. (Docket No. 212.)

-7-

"The proponent of the plan bears the burden of establishing that each requirement set forth in § 1129(a) has been met." *In re Sentinel Mgmt. Group, Inc.*, 398 B.R. 291, 292 (Bankr N.D. Ill. 2008). *See also In re Vita Corp.*, 358 B.R. 749, 750 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525 (C.D. Ill. 2008). The proponent must meet its burden by a preponderance of the evidence. *S. Beach Sec.*, 376 B.R. at 887; *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008); *Rusty Jones*, 110 B.R. at 373. Even absent the filing of an objection to a plan, the proponent must affirmatively demonstrate that the plan is confirmable. *Rusty Jones*, 110 B.R. at 373. Additionally, regardless of whether an objection to confirmation has been raised, the court must determine whether the requirements of § 1129(a), and if applicable, § 1129(b), have been met. *Sentinel*, 398 B.R. at 292; *Vita Corp.*, 358 B.R. at 750; *Rusty Jones*, 110 B.R. at 373. The Court will focus the discussion in the matter at bar on those confirmation requirements that are disputed by the parties. All the other requirements of § 1129(a) have either been met or are inapplicable to the facts in this case and, accordingly, will not be discussed further.

## IV. DISCUSSION

### A. Section 1129(a) Objections to the Plan

#### 1. Section 1129(a)(1)

Section 1129(a)(1) mandates that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The Code does not define the phrase "applicable provisions," however, it is aimed at compliance with 11 U.S.C. §§ 1122 and 1123. *In re S. & W. Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984). The legislative history for this section states that

-8-

"[p]aragraph (1) requires that the plan comply with the applicable provisions of Chapter 11, such as section 1122 and 1123, governing classification and contents of a plan." H.R.REP. NO. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S.REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912.

### i.    Section 1122(a)

Dynegy asserts that the Plan improperly classifies its claim in violation of 11 U.S.C. § 1122.  Section 1122(a) provides as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122.

"Every plan proponent creates its classification scheme with the goal of maximizing the probability that its plan will be confirmed." *In re Bloomingdale Partners*, 170 B.R. 984, 996 (Bankr. N.D. Ill. 1994).  A plan proponent has broad discretion in classifying claims. *Id.* at 997. In other words, a debtor "possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization." *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994) (*citing In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).  The improper classification of claims results in denial of confirmation under § 1129(a)(1). *See S. & W. Enter.,* 37 B.R. at 158 (discussing § 1122(b) and the classification of unsecured claims).

Section 1122(a) "does not expressly require that all substantially similar claims be placed in the same class, nor does it expressly prohibit substantially similar claims from being classified separately." *In re SM 104 Ltd.,* 160 B.R. 202, 216 (Bankr. S.D. Fla. 1993).  Section 1122(a)

-9-

permits classification of claims and interests subject to the restriction that a claim or interest be

included in a certain class only if it is "substantially similar" to other claims and interests in that

class. *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 691 (D. Mass. 2000). Hence,

pursuant to its express language, § 1122(a) requires only that dissimilar claims not be classified

together. *See In re Dow Corning Corp.,* 280 F.3d 648, 661 (6th Cir. 2002). The Code is silent

on how to ascertain whether claims are "substantially similar." *Bloomingdale Partners,* 170 B.R.

at 989. Indeed, § 1122 "provides little guidance as to how claims are to be classified." *In re

Nat'l/Northway Ltd. P'ship,* 279 B.R. 17, 25 (Bankr. D. Mass. 2002).

The Seventh Circuit Court of Appeals addressed the classification of claims in the Chapter

11 context and stated as follows:

> A debtor in bankruptcy has considerable discretion to classify
> claims and interests in a chapter 11 reorganization plan. While a
> debtor may not separately classify claims solely in order to
> gerrymander an affirmative vote on reorganization, claims may be
> classified separately if significant disparities exist between the
> legal rights of the holder[s of the different claims] which render
> the two claims not substantially similar. Claims may also be
> separately classified if there are good business reasons to do so or
> if the claimants have sufficiently different interests in the plan.

*In re Wabash Valley Power Ass'n, Inc.,* 72 F.3d 1305, 1321 (7th Cir. 1995) (internal quotations

omitted). That being said, it has also been noted that "[s]ome limits are necessary to offset a

debtor's incentive to manipulate a classification scheme and ensure the affirmative vote of at least

one impaired class . . . ." *Woodbrook,* 19 F.3d at 317 (citations omitted). The Seventh Circuit

has not defined those limits.

While many tests have been adopted by other courts, the Seventh Circuit has not endorsed

a test. Rather, the Seventh Circuit has opined "that this is one of those areas of the law in which

-10-

it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law . . . ." *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003) (determining the legitimacy of proposed classifications of claims in the Chapter 13 context). The *Crawford* case provides guidance to the Court in the matter at bar. *See In re Quay Corp.*, 372 B.R. 378, 385 (Bankr. N.D. Ill. 2007) ("Opinions construing classification under a plan proposed pursuant to Chapter 13, § 1322(b)(1) may be seen to provide guidance in cases under § 1122(a) of Chapter 11.").

The question then turns to how a court should determine whether claims are "substantially similar." "Similarity is not a precise relationship, and the elements by which we judge similarity or resemblance shift[] from time to time in bankruptcy." *Woodbrook*, 19 F.3d at 318. Lacking a specific test or definition from the Seventh Circuit, the Court turns to other circuits. The Ninth Circuit postulated that the bankruptcy court must evaluate "the nature of each claim, i.e., the kind, species, or character of each category of claims." *In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994). This determination should focus on the nature or legal attributes of the claims and not on the status or circumstances of the claimants. *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004); *see also In re Dow Corning Corp.*, 244 B.R. 634, 644 (Bankr. E.D. Mich. 1999) (defining "substantially similar" as "similar in legal nature, character or effect"), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000); *In re Frascella Enters., Inc.*, 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) ("The similarity of claims is not judged by comparing creditor claims *inter se*. Rather, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.").

-11-

"In other words, the emphasis is not upon the holder of the claim so much as it is upon what type of claim the holder has against the estate." *Sentinel*, 398 B.R. at 298 (*citing Coram Healthcare*, 315 B.R. at 349). "Section 1122(a) does not require 'absolute homogeneity' of all claims or interest[s]." *In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007). Moreover, claims are not required to be classified based on their value. *In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr. D.N.J. 1990).

Dynegy argues that the Plan improperly attempts to "gerrymander" its claim in order to obtain a consenting impaired class. According to Dynegy, the Debtor has no legitimate reason to place it into a separate class from other general unsecured creditors because Dynegy's claim has already been allowed by this Court.

Class 3 consists of all general unsecured claims against the estate. (Debtor Ex. No. 3 at p. 7.) Dynegy's claim was placed in Class 2 along with Greenberg's claim and the Gore Claim. (*Id.* at pp. 6-7.) Draiman explained that the Plan classifies these claims separately because those claims are disputed and are subject to setoff. (Trans. 358:6 - 359:10; *see also* Debtor Ex. No. 3 at p. 9.)

Dynegy disputes the Debtor's rationale for Dynegy's separate classification, asserting that the explanation is "pure fiction" because Draiman testified that insider creditors against whom the Debtor has setoff claims would be paid pro-rata while the Class 2 claimants must wait until their disputes are resolved. (Dynegy Memo. at p. 13.) The fact that Dynegy's claim has been allowed is not dispositive on the issue of whether Dynegy's claim was improperly classified. The important inquiry is whether the Debtor has good business reasons for placing Dynegy in Class 2.

-12-

The Plan as drafted by the Debtor meets the requirements of § 1122. The Debtor is afforded broad discretion in classifying claims and its explanation that the Class 2 claimants were classified separately because those claims are in dispute and potentially subject to setoff shows that the Class 2 claimants have substantially similar claims and sufficiently different interests from the Class 3 claimants. That the Debtor is currently engaged in litigation with the Class 2 claimants is a good business reason for their separate classification. Success against those parties could, in effect, eliminate payment on their claims. The Court finds that the Plan does not improperly classify Dynegy's claim in violation of § 1122.

### ii.    Section 1123(a)(4)

To be confirmed, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest[.]" 11 U.S.C. § 1123(a)(4). The text of § 1123(a)(4) mandates that a confirmable plan provide the "same treatment" for class members. The United States Supreme Court and the United States Court of Appeals for the Seventh Circuit have consistently instructed lower courts to accord statutory terms or words their ordinary, common meaning unless they are specifically defined by the statute or the statutory context requires a different definition. *See, e.g.*, *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 544 (7th Cir. 2003). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what is says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal quotations and citations omitted).

-13-

However, bankruptcy courts have some discretion in deciding whether class members are receiving the same treatment. Section 1123(a)(4) does not require precise equality, only approximate equality. *In re Dow Corning Corp.*, 255 B.R. 445, 497 (E.D. Mich. 2000), *aff'd in part and remanded in part*, 280 F.3d 648 (6th Cir. 2002). The "same treatment" does not mean "identical treatment" and other circuits have "approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration[s]." *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998).

Section 1123(a)(4) "does not require that claims legitimately classified in separate classes receive the same treatment. Whether it is appropriate for a proposed plan to provide different treatment to claims which are legitimately classified in separate classes will arise, if at all, in the context of cramdown." *Dow Corning*, 244 B.R. at 666.

The Plan provides that the Debtor:

> disputes the Dynegy claims [sic] because of the potential successful appeal of the Dynegy Claim, which is not a final judgment, and also the Debtor's significant claim against Dynegy in [the MDL] for the manipulation of national indices on which natural gas was traded, the amount of which claim is greater than the Dynegy claim. The Debtor anticipates objecting to [Greenberg's] claim because of causes of action by the Debtor against [Greenberg] for profession[al] negligence in connection with the Dynegy litigation. [Gore's Claim] arising out of a class action lawsuit is a claim the Debtor believes to be objectionable as well. The Debtor will reserve amounts equal to the allowed, pro-rata amount of these disputed claims, and in the event these claims are allowed in full, the amount paid to unsecured creditors will be significantly reduced, probably to five percent (5%).

. . .

-14-

> No distribution shall be made to the holders of Disputed Claims
> until the dispute is resolved either by agreement or by Order of the
> Bankruptcy Court. Distributions to the holders of Allowed Claims
> shall not be held back pending resolution of Disputed Claims.
> However, in the event a distribution is made to the holders of
> Allowed Claims before all Disputed Claims have been resolved,
> sufficient funds shall be held back to pay the pro rata share due the
> holders of Disputed Claims in the event the dispute is resolved
> against the Debtor.

(Debtor Ex. No. 2 at pp. 3 & 18.) In essence, the Plan proposes to delay payment to Dynegy and

Greenberg until their respective litigations have been finally resolved.[5] In its reply, the Debtor

argues that Dynegy will be paid in the same manner as all other creditors because its claim has

been allowed. (Debtor Reply at. p. 10.) The Court disagrees with the Debtor's statement. The

Plan provides that the Debtor shall continue to dispute the claims of the Class 2 creditors, of

which Dynegy is one. The Debtor is currently engaged in litigation with Dynegy in the Seventh

Circuit, appealing Dynegy's judgment. Until such time as the Debtor has exhausted all appeals

with respect to Dynegy's judgment, the Plan does not require Dynegy to be paid, but instead

requires the funds to be reserved. (Debtor Ex. No. 2 at pp. 3 & 18.) Thus, the Debtor's statement

that Dynegy will be paid in the same manner as all other creditors is inaccurate and not required

by the Plan because Dynegy's judgment is still being disputed under the Plan and is not entitled

to be paid until such litigation is resolved.

---

[5] Dynegy argues that a distribution may not be paid to it until the MDL and the
Illinois Litigation have concluded. The Court disagrees with Dynegy's characterization with
respect to the MDL. The Illinois Litigation will be the final resolution of the validity of
Dynegy's claim. A judgment in favor of the Debtor in the MDL would be a separate claim,
not a basis for invalidating Dynegy's judgment in the Illinois Litigation. Thus, Dynegy's
claim will be finally resolved in the Illinois Litigation.

-15-

Dynegy asserts that it is entitled to receive the value of its claim now and that the Debtor must either pay interest to Dynegy while its distribution is being reserved or value its claim as of the distribution date. While this argument may have merit under § 1129(b), it is misplaced with respect to § 1123(a)(4). *See Dow Corning*, 244 B.R. at 666. The fact that Dynegy's distribution will be delayed does not in and of itself constitute unequal treatment. *See In re New Power Co.*, 438 F.3d 1113, 1122-23 (11th Cir. 2006). In fact, the Plan proposes that the payment of all Class 2 creditors' claims will be delayed and, as such, Dynegy's treatment under the Plan is consistent with Greenberg, its fellow class member.

Dynegy's argument appears to hinge on its § 1122 argument that it should have been placed in Class 3 and treated the same as the general unsecured creditors. However, as noted in *Dow Corning*, § 1123(a)(4) does not require the same treatment as between each class, but only among those claimants in the same class. Thus, the Court finds the Plan provides uniform treatment to Class 2 creditors. Dynegy's argument regarding the treatment of its claim fails under § 1123(a)(4).

### iii.      Sections 541(a) and 1123(b)(3)

Dynegy asserts that the Plan fails to disclose all of the Debtor's assets and potential recovery actions. Dynegy first contends that under § 541(a), the Debtor's assets have not been appraised and without an objective appraisal, the creditors will not be able to ascertain the value of the estate's assets. This argument is misplaced for two reasons. One, § 541(a) imposes no disclosure requirement on a plan proponent and Dynegy has not cited a case stating otherwise. Second, any arguments with respect to appraisal of the estate's assets are better addressed under § 1129(a)(7) and (a)(11).

-16-

Next, Dynegy argues that the Plan fails to disclose and preserve any avoidance actions. Dynegy makes this argument with respect to § 541(a), but it is best considered under § 1123(b)(3), which states that a plan may provide for the retention and enforcement of any claims or interests of the debtor. *See In re Kmart Corp.*, 310 B.R. 107, 120 (Bankr. N.D. Ill. 2004) ("Although section 1123(b)(3) is not an express disclosure or notice statute, it has been viewed by some courts as serving a disclosure and notice function. The debtor . . . is in effect disclosing and giving notice of its intent to reserve estate claims for post-confirmation enforcement.") (citation omitted). Therefore, the Court will address this argument under § 1123(b)(3).

In *D & K Properties Crystal Lake v. Mutual Life Insurance Co. of New York*, 112 F.3d 257, 261 (7th Cir. 1997), the Seventh Circuit held that in order to avoid the res judicata effect of a Chapter 11 plan confirmation order, a plan's reservation of a cause of action must be express–in writing and specifically identified. The plan at issue in *D & K Properties* purported to reserve on behalf of the estate "all causes of action existing in favor of the Debtor and the Debtor in Possession." *Id.* at 259. The court explained that because D & K failed to identify any claim it was reserving, its cause of action was barred. *Id.* at 261. In so holding, the Seventh Circuit explained that "[a] blanket reservation that seeks to reserve all causes of action reserves nothing. To hold otherwise would eviscerate the finality of a bankruptcy plan containing such a reservation, a result at odds with the very purpose of a confirmed bankruptcy plan." *Id.*

The Debtor argues that the very next year, the Seventh Circuit rejected *D & K Properties* stating that a claim need not be "specific and unequivocal" as the "statute itself contains no such requirement." *P.A. Bergner & Co. v. Bank One Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117 (7th Cir. 1998). *Bergner* did not reject *D & K Properties*, as the Debtor asserts,

-17-

but rather supplements that decision. *See Kmart*, 310 B.R. at 124 n.8 (stating that the cases should be read together). That court explained as follows:

> While there might be some logic in requiring "specific and unequivocal" language to preserve claims belonging to the estate that have never been raised, the statute itself contains no such requirement. The courts that have spoken of the need for "specific" and "unequivocal" language have focused on the requirement that plans unequivocally retain claims of a given type, not any rule that individual claims must be listed specifically.

*Bergner*, 140 F.3d at 1117.

"*Bergner* stands for the proposition that plan provisions identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the *res judicata* bar."[6] *Kmart*, 310 B.R. at 124. Claims need not be catalogued by name. *Id.*

With respect to potential causes of action, the Plan states that "[t]he Debtor shall retain any and all claims and causes of action it has against third parties. Such claims and causes of action shall survive and be unaffected by Confirmation of this Plan." (Debtor Ex. No. 2 at p. 18.) The Disclosure Statement provides that "[t]he Debtor continues to investigate, but does not believe any other causes of action, such as avoidance actions under the Bankruptcy Code are present." (Debtor Ex. No. 3 at p. 9.) Under both *D & K Properties* and *Bergner*, this attempted reservation of claims amounts to nothing more than a blanket reservation which, of course, reserves nothing.

---

[6] In *CLC Creditors' Grantor Trust v. Sonnenschein Nath & Rosenthal LLP (In re Commercial Loan Corp.)*, 363 B.R. 559 (Bankr. N.D. Ill. 2007), Judge Goldgar provides a detailed analysis of the many approaches of courts on the issue of what constitutes an effective reservation of claims in a Chapter 11 plan. *Id.* at 567-569.

-18-

Despite the Debtor's failure to adequately preserve any potential claims, such as any claims against insiders like Draiman and Future Associates, Dynegy does not cite any case or statutory provision which provides that this failure constitutes a basis for denial of confirmation, nor has the Court's research revealed any such case. Section 1123(b)(3) merely states that a plan "may" provide for the retention of claim. 11 U.S.C. § 1123(b)(3). Nothing in that section can be construed as a mandate. Similarly, nothing in § 541(a), cited by Dynegy, serves as a basis for denial of confirmation. Therefore, the Court is unwilling to hold that a failure to preserve potential claims is, alone, a basis upon which to deny confirmation.

### iv.    Improper Release

The Seventh Circuit has held that the bankruptcy court may "release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the [B]ankruptcy [C]ode." *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2008). *See also In re Ingersoll Inc.*, 562 F.3d 856, 864 (7th Cir. 2009). Whether the release is "appropriate" is fact intensive and depends on the nature of the reorganization. *Airadigm*, 519 F.3d at 657. The release must be narrow in that it applies only to claims "arising out of or in connection with" the reorganization and does not include "willful misconduct." *Id.* (internal quotation omitted). Moreover, the release may not provide for "blanket immunity." *Id.* The immunity afforded by the release must not affect matters beyond the jurisdiction of the court or unrelated to the reorganization. *Id.* "A nondebtor release should only be approved in 'rare cases' . . . because it is 'a device that lends itself to abuse.'" *Ingersoll*, 562 F.3d at 865 (*quoting In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141, 142 (2d Cir. 2005)).

-19-

Dynegy contends that the Plan improperly releases Draiman from the approximate $18 million debt that Future Associates owes to the Debtor. The Plan does not expressly release any parties, including Draiman. Rather, Dynegy asserts that the Plan provides a *sub rosa* release.[7]

Dynegy's argument misconstrues not only the Plan, but the facts of the case. The Plan does not grant a release either expressly or implicitly to Draiman from the $18 million debt owed to the Debtor by Future Associates. Draiman has filed his own personal Chapter 11 bankruptcy and it is in that case where Draiman could be released from the $18 million debt if he were to receive a discharge. In sum, the Court finds that the Plan does not grant a *sub rosa* release to Draiman. Instead, Draiman's individual case is a separate bankruptcy case which could release him from liability.

### 2. Section 1129(a)(2)

A plan proponent must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history of this section indicates that Congress was concerned "that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure." H.R. REP. NO. 95-695, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6368; S. REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912. Additionally, § 1129(a)(2) mandates compliance with court orders issued in furtherance of the reorganization process. *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 236 (Bankr. D.N.J. 2000).

---

[7] Black's Law Dictionary defines *sub rosa* as "confidential; secret; not for publication." BLACK'S LAW DICTIONARY 1441 (7th ed. 1999).

-20-

Some courts have strictly construed § 1129(a)(2), and denied confirmation for any

violation of the Code. *Id.* at 236-37 (collecting cases). Other courts have taken a less draconian

approach:

> Congress did not intend to fashion a minefield out of the
> provisions of the Bankruptcy Code. In fact, the legislative history
> mentions the provision only in passing, offering as an example of
> compliance that the debtor meet the disclosure requirements of §
> 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that
> *any* infraction, no matter how early on in the case, no matter how
> minor the breach, and regardless of whether the court has remedied
> the violations, should result in a denial of confirmation, Congress
> would have given some clearer indication in the legislative history
> or made the statutory provision far more express.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (citation omitted).

"Nonetheless, 'serious violations of the Bankruptcy Code by a [proponent] can and should result

in a denial of confirmation of a plan under § 1129(a)(2).'" *Great Bay Hotel & Casino*, 251 B.R.

at 237 (*quoting Landing Assocs.*, 157 B.R. at 810).

### i.        Section 727(a)(3)

Dynegy objects to confirmation of the Plan on the basis that the Debtor has failed to

comply with all of the provisions of the Code. Specifically, Dynegy argues that the Debtor failed

to maintain adequate books and records as required by 11 U.S.C. § 727(a)(3).

The Court rejects Dynegy's argument because § 727(a) does not apply to Chapter 11 cases.

The Code provides that "[s]ubchapters I and II of chapter 7 of this title apply *only* in a case under

such chapter." 11 U.S.C. § 103(b) (emphasis added). Section 727 is part of subchapter II, and

thus, applies only in Chapter 7 cases. *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R.

663, 672-73 (Bankr. N.D. Ill. 2010); *Kelly v. Giguere (In re Giguere)*, 165 B.R. 531, 534 (Bankr.

D.R.I. 1994); *Reynolds v. Miller (In re Miller)*, 80 B.R. 270, 270 (Bankr. W.D.N.Y. 1987). *See*

-21-

*also United States Tr. v. Stone (In re Stone)*, Nos. 09-3072, 09-32346, 2009 WL 3459863, at *4

(Bankr. N.D. Ohio Oct. 6, 2009) (stating that "the provisions of Chapters 7, 12 and 13 have

application only to cases filed under their respective chapters"); *E. Wrecker Sales, Inc. v. Parker

(In re Parker)*, 49 B.R. 61, 62 (Bankr. E.D. Va. 1985) (noting that the provisions of § 727 do not

apply to Chapter 13 cases).  Because § 727 is contained within subchapter II of Chapter 7, §

103(b) limits the use of § 727(a) to Chapter 7 cases, unless a specific section of Chapter 11 states

otherwise. *Jahelka*, 442 B.R. at 673; *Williams v. United States (In re Williams)*, 227 B.R. 589,

594 (D.R.I. 1998).  Thus, the Court finds that § 727(a) cannot serve as a basis for objection to the

Plan under § 1129(a)(2).[8]  *See Park View Fed. Sav. & Loan Ass'n v. Rich-Morrow Realty Co. (In*

---

[8]  Section 727(a) is mentioned, however, in 11 U.S.C. § 1141(d).  Section 1141
provides for the discharge of a debtor's pre-confirmation debts. 11 U.S.C. § 1141(d)(1)(A).
This discharge is automatic upon confirmation of the plan, and it applies to all pre-
confirmation debts that have not been excepted from discharge. *Williams*, 227 B.R. at 593.
There are exceptions found in § 1141(d) to this general discharge. Section 1141(d)(3), one
of those exceptions, and the provision that refers to § 727(a), provides as follows:

> The confirmation of a plan does not discharge a debtor if–
> (A) the plan provides for the liquidation of all
> or substantially all of the property of the
> estate;
> (B) the debtor does not engage in business
> after consummation of the plan; and
> (C) the debtor would be denied a discharge
> under section 727(a) of this title if the case
> were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

Hence, § 727(a) applies in Chapter 11 cases only with respect to the discharge denial
provision of § 1141(d)(3). *Jahelka*, 442 B.R. at 673; *Williams*, 227 B.R. at 593-94; *A.M.
Mancuso v. Sullivan (In re Sullivan)*, 153 B.R. 746, 750 n.5 (Bankr. N.D. Tex. 1993).

-22-

*re Rich-Morrow Realty Co.)*, 100 B.R. 893, 895 (Bankr. N.D. Ohio 1989) (stating that "standing

alone, Section 727 is inapplicable to [a debtor's] Chapter 11 case").

### ii.    Failure To File Income Tax Returns

Next, Dynegy argues that the Plan violates § 1129(a)(2) because there is no evidence the

Debtor filed its 2009 state or federal income tax returns.  Dynegy did not cite an applicable

provision of the Code that the Debtor has failed to comply with as required by § 1129(a)(2).  For

this reason, the Court rejects Dynegy's argument.  Nevertheless, the Debtor attached a copy of its

2009 federal income tax return as Exhibit A to the Debtor's Reply, which was stamped received

by the Internal Revenue Service on December 13, 2010.  (*See* Trans. 363:9 - 11.)  Dynegy's

objection with respect to the Debtor's alleged failure to file tax returns is overruled because

Dynegy asserts no statutory basis upon which to deny confirmation.

### iii.    Failure to Comply With the Court's Rule 3020 Order

On December 9, 2010, the Court entered an Order pursuant to Federal Rule of Bankruptcy

Procedure 3020 that required the Debtor to deposit the sum of $100,000 into an account for "the

exclusive purpose of making distributions upon confirmation of the [P]lan."  (Docket No. 291.)

Although Dynegy does not raise this issue in its objections to confirmation, the Court has an

independent duty to ensure that the requirements of confirmation are met.  *Sentinel*, 398 B.R. at

292; *Vita Corp.*, 358 B.R. at 750; *Rusty Jones*, 110 B.R. at 373.

The Court finds that the Debtor has violated § 1129(a)(2) because it has not complied with

a court order issued in furtherance of the reorganization process.  Draiman testified that the

Debtor opened an account and placed $100,000 into it.  (Trans. 363:22 - 364:21; *see* Debtor Ex.

No. 4.)  That money consisted of $30,000 from the Debtor's own funds and $70,000 in new cash

-23-

from Shabat. (Dynegy Ex. No. 26, December 2010.) At trial, the Court questioned Draiman as

to why only $70,000 of new money was deposited instead of the entire $100,000, as was the intent

of the order. (Trans. 411:2 - 5, 13 - 18.) Draiman specifically testified that he misunderstood the

order and would immediately place another $30,000 of new money into the account. (*Id.* at 411:9

- 10, 19 - 25.) To date, the Debtor has not provided this Court with any proof that it has complied

with that Order and the Debtor's monthly operating reports do not indicate that such new money

has been deposited. Thus, the Debtor is in violation of § 1129(a)(2) for failure to fully comply

with the Court's Order.

### 3.    Section 1129(a)(3)

Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by

any means forbidden by law." 11 U.S.C. § 1129(a)(3). The term "good faith" as used in this

section is not defined by the Bankruptcy Code. *In re Madison Hotel Assocs.*, 749 F.2d 410, 424

(7th Cir. 1984). "'[T]he term is generally interpreted to mean that there exists a reasonable

likelihood that the plan will achieve a result consistent with the objectives and purposes of the

Bankruptcy Code.'" *203 N. LaSalle St. P'ship*, 126 F.3d at 969 (*quoting Madison Hotel*, 749 F.2d

at 424-25). In evaluating whether a plan has been proposed in good faith, the focus of the inquiry

is the plan itself, which must be viewed based on the totality of the circumstances surrounding

the development and proposal of that plan. *Madison Hotel*, 749 F.2d at 425; *SM 104 Ltd.*, 160

B.R. at 244.

To be in good faith, a plan must have "a true purpose and fact-based hope of either

'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'" *S. Beach

Sec.*, 606 F.3d at 376 (*quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,

-24-

526 U.S. 434, 453 (1999)).  To find that a plan does not comply with § 1129(a)(3) generally

requires "misconduct in bankruptcy proceedings, such as fraudulent misrepresentation or serious

nondisclosures of material facts to the court." *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr.

E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995).  "Good faith is not synonymous with honesty

and bad faith is not synonymous with dishonesty." *In re Jackson*, 91 B.R. 473, 475 (Bankr. N.D.

Ill. 1988) (Chapter 13 case).

The Seventh Circuit has produced a non-exclusive list of factors embodied in its "totality

of the circumstances" test to consider in determining good faith in Chapter 13 cases.  They

include (1) whether the plan states secured and unsecured debts accurately; (2) whether expenses

are accurately disclosed; (3) whether the percentage distribution to unsecured claimants is

accurate; (4) whether inaccuracies in the plan amount to an attempt to mislead the court; and (5)

whether the proposed payments show fundamental fairness in dealing with one's creditors. *In re

Smith*, 848 F.2d 813, 817-22 (7th Cir. 1988); *In re Rimgale*, 669 F.2d 426, 432-33 (7th Cir. 1982).

*See also In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002); *In re Love*, 957 F.2d 1350, 1355 (7th Cir.

1992); *In re Schaitz*, 913 F.2d 452, 453-54 (7th Cir. 1990).  While these factors were considered

with respect to good faith in Chapter 13 cases, they are still relevant and inform part of the

Court's inquiry here in this Chapter 11 case.

Dynegy sets forth three reasons why this Plan has not been proposed in good faith: (1)

Draiman failed to keep adequate books and records thereby making it difficult to determine if

transfers were made to insiders including Draiman and Future Associates; (2) Draiman enriches

himself in the amount of $18 million by purchasing all the Debtor's assets for a pittance and

releasing himself from a debt he owes the Debtor; and (3) the Debtor made unauthorized post-

-25-

petition transfers to LCF in the sum of $81,000. The Court has already rejected Dynegy's

arguments on the alleged *sub rosa* release and the post-petition transfers to LCF. However,

Dynegy's argument with respect to the failure to reserve causes of action, while rejected under

§ 1129(a)(2), bears on the good faith of this Plan.

As discussed previously, the Plan has only a blanket reservation of all claims and causes

of action the Debtor may have against third parties, which actually reserves nothing at all. *See*

*D & K Props.*, 112 F.3d at 261. Those potential claims and causes of action are against the

Debtor's insiders, such as Draiman, Future Associates, and LCF based on certain transfers. This

failure directly bears on the Plan's good faith.

Another factor to consider is whether the Plan accurately states unsecured debts. The

Court has already mentioned the fact that the Plan has not been amended to reflect two important

changes in unsecured claims. First, Dynegy's judgment was amended to accurately reflect interest

for a total of more than $22 million. This is approximately $7 million more than stated in the

Plan. Another example of the Plan's failure to accurately reflect unsecured debts is the settlement

of the Gore Claim for approximately $200,000. The Plan mentions the Gore Claim, but does not

list its value. Likewise, the Disclosure Statement does not state a value for the Gore Claim.

The next factor to consider is whether the disclosed percentage distribution to unsecured

creditors is accurate. As discussed *infra* in § IV.A.8 with respect to feasibility, unsecured

creditors can hope to receive approximately $48,000 over two years, based on the figures in the

Plan's budget projections. (Debtor Ex. No. 5.) Draiman testified that there might be $30,000 left

to be contributed by Shabat which could go to unsecured creditors. (Trans. 384:3 - 16.)

Assuming, as Exhibit 5 does, that the Debtor is unsuccessful in litigation against Dynegy and

-26-

Greenberg, there will be a maximum of $78,000 available to be distributed to unsecured creditors.

Unsecured claims total approximately $23,505,000.[9]  Based on the Court's calculations, the

minimum amount that would be distributed under the Plan would be approximately 0.3318%.

This number is a far cry from the Plan's suggested minimum five percent distribution.  Clearly,

the Plan does not accurately set forth the expected minimum percentage distribution to unsecured

creditors.

The Plan's failure to adequately reserve claims and causes of action the Debtor may have

against third parties, the failure to accurately state the value of unsecured claims, and the

substantially inaccurate calculation of the Plan's minimum percentage distribution to unsecured

creditors demonstrate to the Court that the Plan has not been proposed in good faith.  Therefore,

the Court sustains Dynegy's objection in finding that the Plan violates § 1129(a)(3).

### 4.        Section 1129(a)(4)

Section 1129(a)(4) requires that payments made by the debtor "for services or for costs

and expenses in or in connection with the case, or in connection with the plan and incident to the

case" be approved as reasonable or subject to the court's approval.  11 U.S.C. § 1129(a)(4).

"Section 1129(a)(4) requires that the court exercise substantive control over fees and costs related

to confirmation and the Chapter 11 case."  *Sentinel*, 398 B.R. at 316.  It is "'designed to insure

compliance with the policies of the Code that (1) the bankruptcy court should police the awarding

of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such

information as might affect the claimants' decision to accept or reject the plan.'"  *In re TCI 2*

---

[9] This total represents the sum of Dynegy's approximate $22 million claim, Greenberg's approximate $1 million claim, the Gore Claim valued at $200,000, and $305,000 in other general unsecured claims.

-27-

*Holdings, LLC*, 428 B.R. 117, 145-46 (Bankr. D.N.J. 2010) (*quoting In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009)). Pre-confirmation payments for fees and expenses incurred in a bankruptcy case have been held to be within the scope of § 1129(a)(4). *In re Cajun Elec. Power Co.*, 150 F.3d 503, 513-14 (5th Cir. 1998).

Dynegy asserts that the Debtor is in violation of § 1129(a)(4) because in August 2010, the Debtor made a one-time rent payment to LCF in the amount of $52,535 for overdue rent, thereby diminishing the Debtor's assets. Dynegy points out that Draiman testified that the Debtor's rent was approximately $2,000 per month, and Dynegy argues that if the Debtor was delinquent fourteen and one-half months, the rental due would total only $29,000.

Draiman's testimony indicated only that the Debtor's current monthly rent payments were approximately $2,000. (Trans. 387:13 - 20.) Draiman testified that prior to filing bankruptcy, the Debtor's monthly rent obligations were approximately $7,000. (*Id.* at 387:21 - 24.) Between February 2010 and April 2010, the Debtor's monthly operating reports reflect that the Debtor made rent payments of $7,505 per month.[10] (Dynegy Ex. No. 26.) Between May 2010 and July 2010, the Debtor made monthly rent payments of $2,089.27. (*Id.*)

This Court has no reason to believe that the Debtor's rent obligations between May 2009 and August 2010 were approximately $2,000, as Dynegy asserts. The Debtor explains the difference between the February 2010 to April 2010 and May 2010 to July 2010 payments by stating that there was a reduction from $7,505 to $2,089.27 as a result of negotiations with Cole Taylor Bank. (Debtor Reply at p. 8.) The Debtor claims that the $52,535 payment was repayment

---

[10] In February 2010, the Debtor paid $15,010 in rent. (Dynegy Ex. No. 26.) The Court finds that this payment likely represents rent for January 2010 as well as February 2010.

-28-

in full for its delinquent post-petition rent. (*Id.*; Trans. 390:21 - 391:4.) The Court notes that the

$52,535 payment is less than the full amount were the rent payments calculated at $7,505 for each

month that the rent was not paid post-petition.[11] There is nothing to indicate that the payment of

$52,535 was unreasonable, given that the Debtor did not appear to overpay on its rental

obligations. Additionally, Dynegy cites no authority for the proposition that the Debtor must

obtain prior authorization by the Court to pay delinquent post-petition rent. Therefore, the Court

approves the payment as reasonable and Dynegy's objection on this point is overruled.

### 5.    Section 1129(a)(7)

Section 1129(a)(7) provides that each holder of an impaired claim who has rejected a plan

must "receive or retain under the plan on account of such claim . . . property of a value, as of the

effective date of the plan, that is not less than the amount that such holder would so receive . . .

if the debtor were liquidated under chapter 7 . . . on such date." 11 U.S.C. § 1129(a)(7)(A)(ii).

This section is often referred to as the "best-interest-of-creditors" test. *203 N. LaSalle St. P 'Ship*,

526 U.S. at 441. "Best interest" means that either (1) each holder of a claim or interest of each

class has accepted the plan or (2) the nonaccepting class member will receive under the plan at

least as much as it would receive upon liquidation. *See* 11 U.S.C. § 1129(a)(7)(A). All claimants

in a class of claims that is impaired under the proposed plan must be accorded treatment under

the plan at least as good as treatment they would receive upon the liquidation of the debtor under

Chapter 7. *Rusty Jones*, 110 B.R. at 373. "'The best interests test applies to individual creditors

---

[11] No rent was paid between May 2009 and January 2010, though $15,010 was paid in February 2010, which likely represents rental payment for January 2010. The petition was filed May 14, 2009, and May should be treated as one-half of a month. Thus, the calculation should read 7.5 months x $7,505 = $56,287.50.

-29-

holding impaired claims, even if the class as a whole votes to accept the plan.'" *Keck, Mahin &*
*Cate*, 241 B.R. 583, 590 (Bankr. N.D. Ill. 1999) *(quoting 203 N. LaSalle St. P'ship*, 526 U.S. at
442 n.13).

The best interests valuation is to be based on evidence not assumptions, but it is not an
exact science. *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992). Failure to
attach a liquidation analysis violates § 1129(a)(7). *In re Modern Steel Treating Co.*, 130 B.R. 60,
64 (Bankr. N.D. Ill. 1991), *aff'd*, No. 91 C 5747, 1992 WL 82966 (N.D. Ill. Apr. 1, 1992).

Dynegy argues that the Plan fails to meet the best interests test because the Plan does not
provide any evidence as to the value of the assets to be distributed to Dynegy, and it does not
provide any meaningful liquidation analysis. The Debtor's assets consist primarily of judgments
against Yehuda and Miriam Draiman, one hundred percent of Yehuda and Miriam Draiman's
stock in certain corporations, employee advances, accounts receivable, claims against Dynegy and
Greenberg, a beneficial interest in the Michigan Avenue Property, which is held in trust, an $18
million debt owed by Future Associates, and a twenty percent interest in Multiut, LLC. (Debtor
Ex. No. 3, Ex. B.)

The Debtor asserts that the judgments against Yehuda and Miriam Draiman are currently
uncollectible and that the accounts receivable and employee advances are uncollectible. (*Id.* at
pp. 21-22; Trans. 370:4 - 373:4; 376:16 - 377:17; 379:20 - 380:4.) Draiman testified that the
portion of employee advances made to Philip Selman were uncollectible because they were
resolved through a settlement agreement. (Trans. 376:20 - 377:6.) However, other employees
are to pay back the advances periodically. (*Id.* at 377:4 - 17.) Draiman testified that he listed the
interests of Yehuda and Miriam Draiman in certain stock as unknown because he has tried to

-30-

pursue it for a number of years to no avail. (*Id.* at 368:16 - 369:3.) Further, Draiman testified that

the beneficial interest in the Michigan Avenue Property was of no value because its value is equal

to the amount of the debt owed on the mortgage. (*Id.* at 369:13 - 25.) As to the Greenberg claim,

Draiman testified that although it was scheduled at an unknown value, he estimates the potential

value of the claim between $5 and $15 million.[12] (*Id.* at 38:8 - 14.) Finally, Draiman testified that

he valued the twenty percent interest in Multiut, LLC at $5,000 because that interest is worthless

without Draiman's involvement as he is the contact for the accounts. (*Id.* at 407:1 - 5; 409:14 -

25.) Draiman admitted that he did not have any of these assets appraised. (*Id.* at 403:18 - 20;

407:6 - 7.)

Draiman's testimony and the Disclosure Statement reflect that the Debtor believes certain

judgments, accounts receivable, and stock are uncollectible because they are old. Draiman did

not testify as to specific collection efforts; the Disclosure Statement offers no other explanation

for why these are currently uncollectible, but may become collectible.

Further, the Debtor values its twenty percent interest in Multiut, LLC at $5,000, even

though Draiman testified that the Debtor's interest will generate $25,000 per year. Under its five-

year projections, the Debtor would earn $125,000 from that interest. Draiman explained this

discrepancy by testifying that he was the contact for the accounts and if the Debtor were to be

liquidated and Draiman no longer involved, the accounts in Multiut, LLC would all leave and the

twenty percent interest would be worthless. Whether or not Draiman's testimony is accurate as

to the intentions of the accounts, the valuation of the twenty percent interest is illogical. If

---

[12] *See In re Polis*, 217 F.3d 899, 902 (7th Cir. 2000) (stating that legal claims must be valued based on the expected judgment amount to be obtained multiplied by the probability of success).

-31-

Draiman's testimony is to be believed, the value of the twenty percent interest should be valued at $0. If it is not worthless, one would think that it should be valued at substantially higher than $5,000, given that the twenty percent interest should generate approximately $125,000 over five years. Either way, it appears that the valuation of the twenty percent interest is inaccurate and arbitrary. While a debtor's valuation of its own assets is to be afforded some weight, *see S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980); *In re Jester*, 344 B.R. 331, 339 (Bankr. E.D. Pa. 2006), the Debtor here provided no independent appraisals and no other extrinsic evidence to support the valuation. As such, the Debtor's valuation of this asset and the Debtor's entire methodology are suspect.

Moreover, neither the Plan nor the Disclosure Statement provides any analysis of the value of the approximate $18 million Future Associates debt. The Debtor explains that it is not a valuable asset because Draiman is in Chapter 11.[13] (Debtor Ex. No. 3 at p. 22; Trans. 377:18 - 25.) The Plan fails to account for any distribution to be made pursuant to a confirmed Chapter 11 plan in that case. There can be no doubt that the amount to be distributed to the Debtor as a result of Draiman's individual bankruptcy will not be affected by whether the Debtor is in Chapter 11 or Chapter 7. The Plan's failure to analyze this asset accurately or in any detail whatsoever favors Dynegy's position.

The Plan's entire liquidation analysis can be summed up as follows: creditors would receive nothing in a Chapter 7, but would receive something in a Chapter 11; thus, creditors are better off in Chapter 11. (Debtor Ex. No. 3 at pp. 21-22; Trans. 378:1 - 18.) Attached to the

---

[13] The Court notes that Dynegy has filed an objection to the Debtor's proof of claim in Draiman's individual bankruptcy case. (09 B 17582, Docket No. 423.)

-32-

Disclosure Statement is the Debtor's Schedule B which lists its personal property as having a scheduled value of approximately $47 million. (Debtor Ex. No. 3, Ex. B.) The Debtor appears to use this Schedule as the basis for its liquidation analysis. However, as the Court has discussed above, the Debtor fails to provide an accurate and reliable valuation of its assets. This failure combined with the attachment of Schedule B to the Disclosure Statement demonstrates the Debtor's weak attempt at a liquidation analysis.

All things considered, the Court finds that the Debtor has not carried its burden of showing that the best interests test has been met. The Debtor provides very little in the way of a liquidation analysis, relying almost solely on its Schedule B. Other than the conclusory testimony from Draiman and assertions in the Disclosure Statement, there is no actual evidence or analysis to indicate what creditors would receive in a Chapter 7 case versus a Chapter 11 case. The Court acknowledges that the creditors may receive more in Chapter 11 because the Plan proposes some payment out of future profits over the term of the Plan. Nevertheless, the Plan's liquidation analysis is insufficient to meet the requirements of § 1129(a)(7). The Court sustains the objection on this point.

### 6.    Section 1129(a)(8)

Section 1129(a)(8) mandates that each class of claims or interests has accepted the plan or is not impaired under the plan. *In re 4 C Solutions, Inc.*, 302 B.R. 592, 596 (Bankr. C.D. Ill. 2003). The Debtor is unable to meet this requirement because Class 2 is an impaired class and voted against the Plan. Therefore, the Plan must comply with the requirements of § 1129(b) in order to be confirmed.

-33-

### 7.    Section 1129(a)(9)

In a Chapter 11 plan of reorganization, all administrative claims must be paid in full under a Chapter 11 plan of reorganization unless the claim holder agrees to different treatment.  11 U.S.C. § 1129(a)(9)(A); *Sentinel*, 398 B.R. at 316.  Administrative expenses include "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A).

An entity with an administrative expense may file a request with the bankruptcy court under § 503(a) that the court then "allows" under § 503(b) after notice and a hearing.  *In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 530 n.13 (Bankr. N.D. Ill. 1992).  When a party is induced to supply goods or services to the estate, § 503(b) requires that those expenses be afforded administrative priority.  *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984).

Dynegy argues that the Plan fails to provide for payment of all administrative expenses because the Debtor failed to make mortgage payments to Cole Taylor Bank on the Michigan Avenue Property during the pendency of the bankruptcy case.  On this basis, Dynegy asserts that the Plan fails to meet § 1129(a)(9) because Cole Taylor Bank has a right to receive an administrative expense distribution.

Draiman testified that not all post-petition mortgage payments were made, but that the Debtor may have offsets that exceed those payments.  (Trans. 381:25 - 383:13.)  Draiman could not testify with any certainty what, in fact, the Debtor owed to Cole Taylor Bank post-petition.  (*Id.* at 383:10 - 13.)

The Plan provides for the holders of "Allowed Administrative Claims" to be paid in cash in accordance with § 1129(a)(9)(A) on the Effective Date of the Plan, unless the holder of such claim agrees to different treatment.   (Debtor Ex. No. 2 at p. 11.)   The Plan defines

-34-

"Administrative Claims" as consisting of all "Allowed Claims for Administrative Expenses." (*Id.* at p. 9.) "Administrative Expenses" are defined as the "cost or expense of administration of this Chapter 11 case, including any actual, necessary expense of preserving or liquidating the estate, or of operating the business of the Debtor and all allowances approved by the Bankruptcy Court in accordance with Section 503 of the Bankruptcy Code." (*Id.* at p. 4.)

Cole Taylor Bank has not yet made a motion to the Court for the allowance of an administrative expense. Because the Plan proposes to pay only those Administrative Claims that have been allowed and Cole Taylor Bank has not made a motion to the Court to allow an administrative expense, the Plan itself does not violate § 1129(a)(9). Therefore, Dynegy's objection is overruled on this point.

### 8.    Section 1129(a)(11)

One of the primary confirmation requirements in dispute is § 1129(a)(11), which provides that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement is commonly referred to as the "feasibility test." *See SM 104 Ltd.*, 160 B.R. at 229 n.49. Bankruptcy courts have an affirmative obligation to ensure that plans are feasible. *Sentinel*, 398 B.R. at 318; (*citing Repurchase Corp.*, 332 B.R. at 343).

The proponent need not demonstrate that a plan carries a guarantee of success. *Id.* Rather, a plan must "provide[] for a reasonable assurance of commercial viability." *Id.* (internal quotation omitted). The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan.

-35-

*Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D. Wyo. 1994), *aff'd*, 56 F.3d 77 (10th

Cir. 1995). "Confirmation should neither be based on speculation nor the visionary projections

of a debtor's champion." *Repurchase Corp.*, 332 B.R. at 343. *See also Travelers Ins. Co. v.*

*Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985) (stating

that § 1129(a)(11)'s purpose "is to prevent confirmation of visionary schemes which promises

creditors and equity security holders more under a proposed plan than the debtor can possibly

attain after confirmation.") (internal quotation omitted).

    Dynegy argues that the Debtor fails to meet its burden of proving that the Plan is feasible

because the distribution to be made under the Plan will not be sufficient to meet even the

minimum five percent distribution, and the Debtor fails to demonstrate that it can achieve

$200,000 of net income in the two years following confirmation.

    The Plan provides that the claims of the general unsecured creditors will be satisfied

through the payment of a twenty percent pro-rata distribution to be paid over a two-year period

on a quarterly basis if the disputed claims of Dynegy and Greenberg are disallowed. (Debtor Ex.

No. 2 at p. 12.) If those disputed claims are allowed, however, the distribution to the unsecured

creditors is "likely to be five percent" to be paid on a quarterly basis over a two-year period. (*Id.*

at pp. 12-13; Debtor Ex. No. 3 at p. 7.) These distributions will be made from the net income

from the Debtor's operations and possibly the remaining funds from Shabat. (Debtor Ex. No. 3

at pp. 3 & 23; Trans. 359:17 - 24.) Draiman testified that under the Plan's budget projections

there would be approximately $100,000 available to pay creditors for years one through five.

(Trans. 362:17 - 363:3.) The Plan's projections actually anticipate approximately $100,000 per

year in net income. (Debtor Ex. No. 5.) Those projections account for certain bankruptcy

-36-

expenses such as taxes, attorneys fees, accounting fees, and United States Trustee's fees. (*Id.*)

After taking those costs into account, the Debtor has approximately $41,000 left over in net

income. As part of that $41,000, the Debtor anticipates $17,000 to be paid to Cole Taylor Bank

for "P&I&Taxes" for the Michigan Avenue Property. (*Id.*) This leaves approximately $24,000

per year remaining.

The Plan provides that Cole Taylor Bank will be paid from the rents received from the

Michigan Avenue Property, approximately $2,000 per month. (Debtor Ex. No. 2 at pp. 2, 11, &

12.) The Plan provides that Cole Taylor Bank's Class 1 claim is unimpaired. (*Id.* at pp. 12-13.)

Thus, Cole Taylor Bank will presumably be paid the full value of its claim under the Plan. There

are a number of problems with the Plan's projections as they relate to Cole Taylor Bank. First,

the budget projections do not clearly explain the intended use of the $17,000 listed as

"P&I&Taxes" for the Michigan Avenue Property. The Court can only surmise that the money

will be used to pay principal, interest, and property taxes for the Michigan Avenue Property. This,

then, leads to a second problem. If the $17,000 does not include any monthly payments to be

made to Cole Taylor Bank on account of its Class 1 claim, the Plan projections fail to account for

those payments at all. The Court is unsure how the $17,000 could possibly include monthly

payments on Cole Taylor Bank's Class 1 claim because those payments are to be approximately

$2,000 per month, well above the $17,000 figure. It seems more likely that the $17,000 relates

to property taxes instead of payments on Cole Taylor Bank's Class 1 claim.

The Plan's budget projections indicate that net cash flow from the Michigan Avenue

Property is to be approximately $18,000 per year. (Debtor Ex. No. 5.) As discussed above, the

Plan's projections do not appear to account for the monthly payments on the Class 1 claim.

-37-

Therefore, the Debtor's projected net income after subtracting bankruptcy expenses and the payment on the Class 1 claim must be reduced. Based on the Court's understanding of the Plan's net income projections and after accounting for the subtraction of the rental income, the Debtor's final net cash flow that would be available to pay unsecured creditors is approximately $6,000 per year.

Even if the Court's understanding of the budget projections is incorrect and the $17,000 expense does relate to payment of Cole Taylor Bank's Class 1 claim, the net cash available to pay unsecured creditors is approximately $24,000 per year. (*Id.*) The Plan provides that unsecured creditors will be paid quarterly over a two-year period. Thus, under the Plan's projections, unsecured creditors can hope to receive only $48,000 over two years and possibly an extra $30,000 still to be contributed by Shabat. (*See* Trans. 384:3 - 16.) At best, unsecured creditors can hope to receive a total of $78,000 over two years if the Debtor does not succeed in litigation against Dynegy or Greenberg. The Plan estimates the Class 3 general unsecured claims as totaling $305,000. (Debtor Ex. No. 2 at p. 22.) Assuming Dynegy and Greenberg's claims are allowed, those claims would total over $23,000,000. Finally, because the Court has no evidence to show, as the Debtor argues, that the Gore Claim has been withdrawn, the Court assumes that the Gore Claim exists in the amount of $200,000. (*See* Docket No. 212.) Unsecured claims would therefore total approximately $23,505,000. According to the Court's calculations, unsecured creditors would receive less than a one percent distribution on their claims.[14] On that basis, the Court finds that the Plan is not likely to meet its projected minimum percentage distribution to unsecured creditors.

---

[14] $78,000 ÷ $23,505,000 = 0.3318%

-38-

Dynegy's next argument focuses on the Debtor's projected net income prior to deducting bankruptcy-related expenses. Dynegy argues that the Debtor is unlikely to meet this $100,000 figure because the Debtor's 2009 income statement reflects that the Debtor's net income was only $69,000. (*See* Debtor Ex. No. 3, Ex. D.) The Debtor rests its entire argument with respect to feasibility on the 2009 income tax return which provides that its "ordinary business income" was $182,777, nearly double the Plan's projections. (Debtor Reply, Ex. A; *see* Trans. 363:12 - 19.) The Court notes that the Debtor's 2009 income tax return was not offered into evidence at trial, but was only produced post-trial in reply to Dynegy's memorandum in objection to confirmation. As evidenced on the face of the income tax return, it was filed on the first day of trial, December 13, 2010, and could have been offered into evidence, but was not. Thus, neither the Court nor Dynegy has had an opportunity to hear or present evidence on the income tax return.

Still, the Court takes note of the discrepancies between the Debtor's 2009 income tax return and its 2009 income statement and monthly operating reports. The Debtor's 2009 income statement, attached as Exhibit D to the Disclosure Statement, represents that the Debtor's total revenues were $1,267,204 and its net income was $69,085. (Debtor Ex. No. 3, Ex. D.) Likewise, the Debtor's ending balance in all bank accounts for December 2009 was $27,672.55. (Dynegy Ex. No. 26.) The 2009 income tax return lists the Debtor's total income as $1,335,945. (Debtor Reply, Ex. A.) The Debtor attempts to bolster its argument by stating that it paid over $100,000 in attorneys' fees in 2009. (*Id.* at p. 5.) The Court has no direct evidence of the alleged $100,000 paid for attorneys' fees. The only evidence of attorneys' fees paid out by the Debtor is reflected in the monthly operating reports as a $12,500 payment to Joseph Tighe in December 2009. (Dynegy Ex. No. 26.)

-39-

The Debtor fails to explain the inconsistencies between the Debtor's 2009 income statement, monthly operating reports, and 2009 income tax return. The inconsistencies lead the Court to question the credibility of those documents and the Plan's projections as a whole. The most reliable evidence the Court has before it as to the feasibility of the Plan's projected net income is the 2009 income statement which was admitted into evidence. That income statement reflected a net income of only seventy percent of the Plan's projected net income.

The Court finds that the Plan's projected minimum five percent distribution to unsecured creditors is highly unlikely given the actual amount likely to be distributed to unsecured creditors. Moreover the Debtor's budget projections, 2009 income statement, and 2009 income tax return are inconsistent and, thus, they significantly undermine the credibility of the Plan's projections. Therefore, the Court finds that the Plan fails to meet the feasibility requirement of § 1129(a)(11) by a preponderance of the credible evidence.

**B.      Section 1129(b) Objections to the Plan**

The Debtor was unable to satisfy § 1129(a)(8). Nevertheless, a plan may be confirmed if it meets all the other requirements of § 1129(a) and § 1129(b). The Bankruptcy Code provides for confirmation of a proposed plan without the unanimous consent of all classes of creditors in a process known as "cram down." *See Airadigm*, 547 F.3d at 768. Section 1129(b) protects dissident classes. *In re Pullman Constr. Indus., Inc.*, 107 B.R. 909, 939 (Bankr. N.D. Ill. 1989). The relevant provisions of § 1129(b) provide as follows:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

-40-

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides–

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims–

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b).

-41-

Thus, in order to proceed under this provision, at least one impaired class of claims must vote in favor of the plan. *In re OBT Partners*, 214 B.R. 863, 867 (Bankr. N.D. Ill. 1997). Class 3 is impaired and voted in favor of the Plan. Class 2 was the only impaired class to reject the Plan.

There are two conditions that must be met in order for a plan to be crammed down. *203 N. LaSalle St. P'ship*, 526 U.S. at 441. First, each requirement of § 1129(a) must be established, except for acceptance of the plan by each impaired class of claims or interests under § 1129(a)(8). *Id.* Second, the objection of an impaired class may be overruled if the plan does not discriminate unfairly, and is fair and equitable as to each class of claims or interests that is impaired and has not accepted the plan. *Id.* In other words, a plan may be confirmed over the objection of an impaired creditor only if the creditor receives "fair and equitable" treatment. *In re Bloomingdale Partners*, 155 B.R. 961, 974 (Bankr. N.D. Ill. 1993). Although the Court finds that the Plan does not meet all of the requirements of § 1129(a), the Court will still address § 1129(b). First, the Court will discuss whether the Plan discriminates unfairly. Then, the Court will address whether each creditor receives "fair and equitable" treatment.

### 1.    Discriminates Unfairly

Dynegy argues that its treatment under the Plan is inherently unfair for several reasons: (1) Dynegy will not receive payment under the Plan until some future unknown date when the Debtor has exhausted all appeals; (2) the Plan fails to provide for the protection of Dynegy's distribution; (3) the Plan does not provide for payment of interest to Dynegy for the time value of its distribution; and (4) the Plan unfairly favors certain creditors such as Draiman, Future Associates, and LCF.

-42-

In order to determine if a Plan unfairly discriminates in violation § 1129(b)(1), one must show that (1) there is a legally acceptable rationale for such discrimination and (2) the discrimination is necessary in light of the rationale. *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), *aff'd*, 195 B.R. 692 (N.D. Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999).

Dynegy first argues that the Plan is unfair because it will be paid at some future unknown date. As discussed with respect to § 1123(a)(4), the Debtor argues that payment to Dynegy on its claim will not be delayed because it has be allowed by this Court. However, the Court has already rejected this argument because the Plan expressly states that Class 2 claims will not be paid until such disputed claims are resolved, which Dynegy's claim is not as long as the judgment is being appealed. Also with respect to § 1123(a)(4), the Court has stated that delay in payment of a claim does not itself constitute unequal treatment. *See New Power*, 438 F.3d at 1122-23.

Applying the test from *203 North LaSalle Street*, the Court finds that the Plan does not discriminate unfairly simply because payment on Dynegy's claim will be delayed pending resolution of litigation. First, it is reasonable to delay payment on a claim, even an allowed claim, pending final resolution of the validity of the underlying judgment. Second, Dynegy's treatment under the Plan is necessary because if the Debtor is successful in the litigation against Dynegy, the value of the claim might be reduced to zero. If the Plan did not delay payment on Dynegy's claim then the Debtor would be forced to pursue Dynegy for the return of the funds. Dynegy's argument fails.

Second, Dynegy argues that the Plan fails to protect its distribution under the Plan. Specifically, Dynegy contends that the Plan does not adequately protect Dynegy's distribution

-43-

because the Plan merely states that it will reserve that distribution. The Plan provides that Class

2 claimants will be paid upon resolution of their disputed claims. (Debtor Ex. No. 2 at p. 12.)

Until such time, those funds will be held back to pay the pro-rata share due those claim holders

in the event the disputes are resolved against the Debtor. (*Id.* at p. 18.) The Court finds that the

Plan's provision to hold back the Class 2 distribution until such time as the disputes are resolved

adequately protects Dynegy's distribution under the Plan. Also, Draiman testified that the Debtor

intends to set up an escrow in which to reserve the Class 2 distributions. (Trans. 412:7 - 19.)

Hence, Dynegy's argument is without merit.

Dynegy next argues that the Plan discriminates unfairly because it does not provide for

interest while Dynegy's distribution is reserved, or value Dynegy's claim as of the distribution

date. Citing *Till v. SCS Credit Corp.*, Dynegy argues that the deferral of payments to it while

other creditors receive a distribution discriminates unfairly because a "debtor's promise of future

payments is worth less than an immediate lump-sum payment of the same total amount because

the creditor cannot use the money right away, inflation may cause the value of the dollar to

decline before the debtor pays, and there is always some risk of nonpayment." 541 U.S. 465, 474

(2004).

*Till* was a Chapter 13 case which dealt with an objection by a secured creditor to the

interest rate to be paid to it under the plan. The Supreme Court explained that there is a time

value to money and, as such, creditors should be appropriately compensated. *Id.* at 477. ("Rather,

the court should aim to treat similarly situated creditors similarly, and to ensure an objective

economic analysis would suggest the debtor's interest payments will adequately compensate all

such creditors for the time value of their money and the risk of default.") (footnote omitted).

-44-

Even though *Till* was a Chapter 13 case, the principle is still applicable to this situation. Under the terms of the Plan, Dynegy will not be paid until its dispute is resolved. There is no time-table for the resolution of the dispute. It could be weeks, months, or even years until Dynegy could receive its distribution. The Plan must appropriately compensate Dynegy for that delay. The Plan fails to do so and, therefore, discriminates unfairly in violation of § 1129(b).

Finally, Dynegy maintains that the Plan is not fair and equitable because it prefers certain claims of the Debtor's insiders, namely Draiman, Future Associates, and LCF. Dynegy asserts that certain claims of the Debtor's "insiders" are classified as general unsecured claims and payment on them will not be reserved or deferred, even though those claims are subject to setoff.

As previously discussed, the Debtor's explanation for Dynegy's and Greenberg's treatment under the Plan is two-fold. Those claimants are classified separately and treated differently because the Debtor is still engaged in litigation with those claimants and those claims are subject to setoff.

Setoff on its own may not be a sufficient rationale, but the Debtor is still engaged in litigation with Dynegy disputing its judgment. While the Debtor's "insiders" may be subject to setoff as well, the Debtor is not currently engaged in litigation with respect to their claims. This is an important distinction because, as discussed above, it justifies Dynegy's delayed payment. As a result, Dynegy's objection regarding the improper classification of claims is overruled.

In summary, the Court finds that the Plan discriminates unfairly because it does not provide for interest to be paid to Dynegy while its distribution is held back pending resolution of the litigation. Dynegy's other arguments under this subsection are overruled.

-45-

### 2.   Fair and Equitable Treatment

A plan satisfies the "fair and equitable" requirement with respect to a secured claim if it fulfills clauses (i), (ii), or (iii) of § 1129(b)(2)(A). *Airadigm*, 547 F.3d at 768. The Court recognizes that no secured party has maintained that the Plan improperly crams down a secured claim. Therefore, the only issue that remains is whether the Plan properly crams down the dissenting unsecured claims, specifically Dynegy's claim.

A plan meets the "fair and equitable" requirement with respect to an unsecured claim if it fulfills clauses (i) or (ii) of § 1129(b)(2)(B). Clause (i) is fulfilled if the holder of the claim receives or retains, on account of such claim, as of the effective date of the plan, property of a value equal to the allowed amount of such claim. 11 U.S.C. § 1129(b)(2)(B)(i). Clause (ii) is satisfied if the holder of any claim or interest that is junior to the claims of such class does not receive or retain under the plan on account of such junior claim or interest, any property, except when the debtor is an individual, the debtor may retain estate property under 11 U.S.C. § 1115, subject to the requirements of § 1129(a)(14). 11 U.S.C. § 1129(b)(2)(B)(ii). The Plan is unable to meet clause (i) because it does not propose to give unsecured creditors the full value of their claims on the Effective Date.[15]

### i.   Absolute Priority Rule

Dynegy asserts that the Plan violates the absolute priority rule because Draiman proposes to retain his one hundred percent ownership interest in the Debtor based on a $100,000 contribution by Shabat. The absolute priority rule is one of the conditions of the "fair and

---

[15] Dynegy makes a one-sentence argument that the Plan is not fair and equitable because it grants Draiman and LCF *sub rosa* releases. The Court has already denied this argument in § IV.A.1.iv.

-46-

equitable" standard necessary for cram down and has been explained by the United States

Supreme Court as follows:

> a dissenting class of unsecured creditors must be provided for in
> full before any junior class can receive or retain any property under
> a reorganization plan. The rule had its genesis in judicial
> construction of the undefined requirement of the early bankruptcy
> statute that reorganization plans be fair and equitable. The rule has
> since gained express statutory force, and was incorporated into
> Chapter 11 of the Bankruptcy Code adopted in 1978. *See* 11
> U.S.C. § 1129(b)(2)(B)(ii).

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citations omitted).

The Seventh Circuit has recognized an exception to the absolute priority rule called the

"new value exception." In order to qualify for the exception, one must contribute capital which

is "new, substantial, necessary for success of the plan, reasonably equivalent to the value retained,

and in the form of money or money's worth." *203 N. LaSalle St. P'ship*, 126 F.3d at 963 (*citing*

*Woodbrook*, 19 F.3d at 319-20).

Dynegy makes two arguments with respect to the absolute priority rule. First, Dynegy

asserts that the $100,000 contributed by Shabat on behalf of Draiman is suspect because there is

the potential for "collusion and mischief." (Dynegy Memo. at p. 23.) Second, Dynegy maintains

that there is no evidence to support that the $100,000 contribution is reasonably equivalent to the

value of the property to be received by Draiman.

The Court rejects Dynegy's argument that the $100,000 contribution is suspect. The

potential for "collusion and mischief" has absolutely no bearing on the issue of whether Draiman

is offering "new value" for his one hundred percent interest in the Debtor. Furthermore, Dynegy

fails to cite any authority that supports this argument.

-47-

As to Dynegy's second argument, the Court finds that the $100,000 to be contributed to the Plan is new, necessary for the success of the Plan, and in the form of money or money's worth. The contribution is to be made by Shabat on behalf of Draiman, although Draiman testified that he did not know if that money was a loan or a gift. (Trans. 384:21 - 24.) Whether the contribution is a loan or a gift to Draiman is of no consequence. It is not the Debtor who would be borrowing money, but Draiman himself. Thus, the contribution would be new as to the Debtor regardless. The contribution is also necessary for the success of the Plan. Without that contribution, there likely would not be enough funds with which to pay administrative claimants in full on the Effective Date of the Plan. Finally, the contribution is obviously in the form of cash.

The only issue remaining is whether the contribution is reasonably equivalent to the value retained by Draiman. Dynegy argues that there is insufficient evidence to demonstrate that $100,000 is reasonably equivalent to the value of Draiman's one hundred percent interest in the Debtor. Draiman testified that he contributed $100,000 to the Debtor in exchange for the retention of his one hundred percent interest in the Debtor. (*Id.* at 352:24 - 353:8.) As the Court discussed with respect to the best interests test, the Debtor has not provided any real liquidation analysis that would indicate the value of the Debtor's assets in a Chapter 7 case versus the value to be distributed in Chapter 11. The Plan has not valued the Debtor's claim against Future Associates or Greenberg. In fact, Draiman testified that the Debtor's only value to unsecured creditors was in its office equipment and furniture worth approximately $15,000. (*Id.* at 378:1 - 10.)

The Plan fails to adequately estimate the value of the Debtor's assets. Therefore, the Court cannot determine whether the $100,000 contribution is reasonably equivalent to Draiman's

-48-

one hundred percent ownership interest.  As such, the Court sustains Dynegy's objection on this point.

Based on the foregoing, the Court finds that the Plan violates § 1129(b) because it discriminates unfairly by not providing for interest to be paid to Class 2 claimants while their distributions are reserved pending resolution of litigation.  Furthermore, the Plan violates § 1129(b) because the Court cannot conclude that the $100,000 contribution is reasonably equivalent to the value to be received by Draiman.  On all other arguments as to cram down, Dynegy's objections are overruled.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court sustains in part Dynegy's objections and denies confirmation of the Plan.  Because the Court has denied confirmation of the Plan and the case has been pending for approximately two years, the Court sets a hearing on May 24, 2011, at 10:00 a.m. to determine whether the case should be converted to Chapter 7 or dismissed.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate order shall be entered pursuant to Federal Rules of Bankruptcy Procedure 5003 and 9021.

**ENTERED:**

DATE: _4/19/11_

_____
John H. Squires
**United States Bankruptcy Judge**

cc:   See attached Service List

## SERVICE LIST

### Multiut Corporation
### Bankruptcy Case No. 09 B 17575

Scott R. Clar, Esq.
Crane, Heyman, Simon, Welch & Clar
135 S. LaSalle Street, Suite 3705
Chicago, IL 60603-4297

Joseph A. Baldi, Esq.
Donna B. Wallace, Esq.
Baldi Berg & Wallace, Ltd.
19 S. LaSalle Street, Suite 1500
Chicago, IL 60603

Kathryn M. Gleason, Esq.
Office of the United States Trustee
219 S. Dearborn Street, Suite 873
Chicago, IL 60604

R. Scott Alsterda, Esq.
Ungaretti & Harris LLP
70 West Madison Street, Suite 3500
Chicago, IL 60602

Patrick S. Layng, United States Trustee
219 S. Dearborn Street
Suite 873
Chicago, IL 60604

Eugene J. Geekie, Jr. Esq.
Barry S. Hyman, Esq.
Karen V. Newbury, Esq.
Schiff Hardin LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606

Pia N. Thompson, Esq.
Gould & Ratner
222 North LaSalle Street, Suite 800
Chicago, IL 60601

Alan J. Mandel, Esq.
Alan J. Mandel, Ltd.
7520 North Skokie Blvd.
Skokie, IL 60077

David R. Herzog, Esq.
Herzog & Schwartz PC.
77 West Washington Street, Suite 1717
Chicago, IL 60602

Larry D. Drury, Esq.
Larry D. Drury, Ltd.
100 North LaSalle Street, Suite 1010
Chicago, IL 60602